**BOSTON INS. CO. et al. v. MESICK & MESICK, Inc.**

**PROVIDENCE-WASHINGTON INS. CO. et al. v. SAME.**

(District Court, D. Connecticut. February 17, 1923.)

Nos. 2343, 2344.

1. **Navigable waters ⬥⟹26(3)—Evidence held to show wreck was lighted and marked.**

In suit for damages sustained when steamer collided with the wreck of a barge in Norwalk Harbor, evidence *held* to show by fair preponderance thereof that the wreck was properly lighted and marked as required by the statute and that the accident happened through no fault of defendants.

2. **Evidence ⬥⟹586(3, 4)—Positive evidence entitled to greater weight than negative evidence.**

Positive evidence of witnesses who hear a sound or see an object is entitled to greater weight than the negative evidence of persons who fail

---

⬥⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

to hear or see the same, especially where the subject-matter to which the witnesses testify dates back four years.

**3. Navigable waters ⊚⟹24—Negligence respecting wreck measured by reasonableness or prudent conduct.**

Under Act March 3, 1899, § 15 (Comp. St. § 9920), requiring the owner of any sunken craft to mark it with a buoy or beacon during the day and a lighted lantern at night, the test of negligence on the part of the owners of a sunken barge must be measured by the reasonableness or prudent conduct of the person charged with the duty of complying with the statute.

**4. Evidence ⊚⟹77(1)—Absence of witness held to raise no inference adverse or favorable to party.**

In suits for damages to a steamer and cargo colliding with a wrecked barge, brought by insurance companies who had paid the loss, their failure to call the captain or offer his deposition raised no inference necessarily adverse to them, particularly where his illness was certified by a reputable physician, but it could not be assumed that his testimony could be beneficial to the libelants.

In Admiralty. Two libels by the Boston Insurance Company and another and by the Providence-Washington Insurance Company and others against Mesick & Mesick, Incorporated. Libels dismissed.

Harrington, Bigham & Englar, of New York City (Henry B. Potter and Corning G. McKennee, both of New York City, of counsel), for libelants.

Macklin, Brown, Purdy & Van Wyck, of New York City (William F. Purdy, of New York City, and George E. Hall, of New Haven, Conn., of counsel), for respondent.

THOMAS, District Judge. These libels were filed by the various insurance companies named against Mesick & Mesick. Two actions are brought, one to recover damages for loss of cargo aboard the steamer Marion, and the other for the loss sustained by the hull of the Marion. Both actions are predicated upon the negligence of the respondent, and, as they were tried together, they will be decided together, as the evidence in the one case is equally applicable to the other.

The suits have been brought against Mesick & Mesick, Inc., by the insurance companies who have paid the losses to the owners of the Marion, and they have been subrogated to the rights of the owners. The loss to the Marion and her cargo was sustained when she ran upon and over the wreck of the barge Kingdon about 9:30 on the morning of March 7, 1918, and about one hour after she had cleared her Norwalk dock bound for New York City laden with freight, as a result of which she sank.

The Kingdon was a coal barge owned by the respondent and was one of a tow of six barges that was sunk bottom side up in Norwalk Harbor during a severe storm on the night of December 12, and the morning of December 13, 1917.

The Marion ran over this wreck about 9:30 in the morning, at which time the weather was clear and visibility good. It had been snowing earlier, but the weather cleared about 8 o'clock. There is a conflict in the testimony as to the condition of the harbor with respect to ice, but

⊚⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

certain it is that after the Marion reached the fairway what ice there was did not in the least interfere with the navigation of the steamer as she was approaching the wreck of the sunken barge.

During the night of March 6th a thin sheet of ice had formed in the channel described as overnight ice, which it was difficult for power boats to break through, but by the time the Marion was approaching the Kingdon there was no ice to speak of which interfered with her navigation through the channel.

These actions are brought under the provisions of section 15, c. 425, of the Laws of 1899 (Comp. St. § 9920; 30 St. L. 1152), which, so far as is here pertinent, provide:

"It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft; or to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft. * * * And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful," etc.

The location of the Kingdon was about one-half mile north by east one-half east from Green Ledge Lighthouse, which is the last light before the open part of Long Island Sound is reached. There is dispute between the witnesses to the exact location of the Kingdon, but the better evidence shows that she was not in the middle of the channel, but to the southerly side of the channel and to the south far enough to be avoided by vessels using the center of the channel.

The tide at this point was high at 5:14 in the morning so that when the accident happened it was about two hours from low tide. At low tide the Kingdon was two or three feet out of water and easily visible to an attentive navigator. At the time of the collision it is apparent that she was probably awash with a slight rip running over her—and possibly the northerly end slightly exposed.

[1] The claim of negligence on the part of the respondent as charged by the libelants is that the respondent failed to perform its statutory obligation to "immediately mark it (the barge) with a buoy or beacon during the day and a lighted lantern at night and to maintain such marks until the sunken craft is removed or abandoned."

The issue is joined in the answer on the defense that the barge was not lying in the channel, that it was marked, buoyed, lighted at all times as required by law, and was marked, buoyed, and lighted at the time of the collision, and that the accident was due solely to the negligence of those in charge of the navigation of the Marion, in that they were incompetent, and were off their course, and in that they failed to keep a lookout, and that they knew, or in the exercise of ordinary care should and would have known, of the existence and location of the wreck of the Kingdon.

The main question of fact is whether the Kingdon was properly lighted on the night of March 6th and properly buoyed on the morning of March 7, 1918. Both sides introduced the testimony of many wit-

nesses in support of their respective contentions. The testimony of many witnesses in support of the libelants' claims is negative, while that of many witnesses introduced by the respondent is positive. The respective witnesses for each side are equally certain and positive that they are correct in what they saw and did as well as in what they did not see or do. So that, at the outset, it is clear that it will be necessary to carefully analyze the testimony and apply principles of law applicable to such a situation as is here presented in order to reach a conclusion in harmony with the law and the evidence.

Testimony in behalf of the libelants was given at great length by many residents of Norwalk who have resided along the shore front for many years and who claim to be familiar with the harbor, the channel, and Green Ledge Lighthouse, and all of them testified, substantially, that at low water anywhere from one to two feet of the barge was exposed to view—that at mean tide it was just awash and that at high tide it was completely submerged and not visible to any one. They further testified that after the first four or five days following the wreck of the Kingdon, when it is apparently conceded by the libelants that the barge was marked with a red light and a fender and a buoy, there were no markings of any kind that were observed. These witnesses claim to have had a good view of the wreck, and knew of the general location of the barge. Some of them were employed at Bell Island and elsewhere along the shore front, and some were employed on oyster boats, and these witnesses testified that they had occasion to run in and out of the harbor and in doing so passed the barge and Green Ledge Light. Yet it is a fact that there was very little traffic in and out of the harbor during the winter of 1917 and 1918 because of the thick ice caused by the very severe winter weather which prevented boats, except powerful tugs, from passing in and out of the harbor.

Other witnesses are residents of Rowayton—a suburb to the west of Norwalk—whose business took them to the seashore and they testified that they had opportunity to observe the conditions with reference to the location of the sunken barge and the markings on it, although it is to be noted that the distance from the shore to the sunken barge was all of a mile or more.

On the other hand, there has been presented by the respondent positive testimony showing and tending to show that the wreck of the Kingdon, at least part of it, was visible at all times to some extent, and at low tide as much as four or five feet; the rise and fall of the tide being variously estimated as from seven to nine feet.

The respondent produced Frank L. Thompson, Richard G. Hendrick, Thomas A. Hendrick, and others, the first two of whom claim to have been employed and paid by the respondent for the purpose of attending to the lights and the buoy on the barge. These witnesses testified without equivocation, and positively, to the effect that the barge was at all times properly lighted at night with a red light, and that there was a fender on the barge to which was attached a white cloth at all times visible during the day. This fender was a heavy piece of timber from 14 to 16 feet long, securely spiked to the barge. Other

testimony was offered to the effect that the barge was lighted by night and marked by day and this condition prevailed on the morning of the disaster. At a time shortly prior to the accident, Thompson, who was in the lighthouse at the time, testified that the peculiar or unusual course the Marion was steering attracted his attention, and that he observed the course the Marion was steering as she was approaching the Kingdon, and that her course was to the south of the center of the channel and out of the regular course taken by vessels coming out of the harbor, and that at that time the stake with a white rag was on the Kingdon—clearly indicating her position.

It further appears that Capt. Hall and Capt. Walling were in the pilot house of the Marion at the time of the collision, and it is conceded that there was no lookout at the bow. Hall was not produced as a witness. His absence was explained by the fact that he was ill and unable to be in court because of his physical condition. Walling's testimony, while unsatisfactory, shows that prior to the accident he had made three or four trips on the Marion to and from New York and had been through the channel, on the oyster boat Standard, and had made several trips through it in January and February. He left the Standard to take the Marion on February 13th. It appears that he had heard about the wreck of the barges, but had made no effort to find out where they were. He also—naturally—denies that there was any buoy or fender, or light to indicate the location of the Kingdon.

In view of all this testimony, the kind and character of it, the question is: Which side is the more credible—which set of witnesses is to be relied upon to ascertain what the facts were on the morning of March 7th? In the face of such testimony as this record discloses, it is difficult to reach a certain conclusion lest in reaching that conclusion the impression prevails that the court finds that one set of witnesses is truthful and the other set untruthful. I have gone over carefully the large volume of evidence and the exhibits several times in an endeavor to reach the right conclusion and to avoid reaching a conclusion which would characterize one set of witnesses as testifying falsely. It was apparent that each witness was honest in his belief respecting the facts to which he testified. During my consideration of the evidence, the impression has always prevailed that the witnesses who have testified positively as to what they did and as to what they saw—witnesses who withstood the cross-examination without being materially shaken, and who could not be mistaken about the close details of what they did, and who apparently have no motive in testifying to anything but the truth—are entitled to the greater weight.

It is entirely probable, and the conclusion to be drawn from the evidence is clear, that the markings existed, and that the light burned nightly without these facts having made any particular or lasting impression upon the minds of the witnesses who testified for the libelants. After all, there was no particular reason why they should observe the Kingdon after she was sunk, and if they did observe, being called to court some four years after the event occurred, it is reasonable to suppose, in view of the positive testimony to the contrary, that

the details of the matter in which they had no direct interest were either partially or entirely erased from their memory.

[2] Speaking of the comparative value or weight of positive and negative evidence, the cases all hold that positive evidence of witnesses who hear a sound or see an object is entitled to greater weight than the negative evidence of persons who fail to hear or see the same.

The rule is stated by the Circuit Court of Appeals for the First Circuit in The Philadelphian, 61 Fed. 863, 10 C. C. A. 128, in the following manner:

"The testimony in behalf of the steamer comes from intelligent witnesses, who were in position to know fully the measures taken to avoid a collision, in respect to which they testify, and shows that every precaution required of those navigating the steamer, for the avoidance of the collision, was promptly exercised. The failure of witnesses looking on from remote points, or even of those aboard the schooner in motion, to observe or to know such precautions, cannot overcome this clear consent of evidence from the witnesses who co-operated in those precautionary maneuvers."

And this rule is particularly pertinent and persuasive here when it is noted that the subject-matter to which the witnesses testified dates back four years.

Judge Waddill, in discussing the rule in The Richmond (D. C.) 114 Fed. 208, said at page 211:

"This positive testimony by those on the schooner, in a position to see the lights, and know of their condition, will not be lightly rejected because other persons, whose duty it was to have seen them, either failed to observe, or happened not to see them. Negative evidence of this character cannot be accepted to outweigh positive evidence. The failure to observe a light cannot be said to disprove its existence."

In The Charlotte (D. C.) 124 Fed. 989, Judge Waddill later restated the rule, on page 991, in the following manner:

"Positive evidence of witnesses who hear a sound or see an object is entitled to greater weight than the negative evidence of persons who failed to see or hear the same."

In my opinion the crux of this whole case turns on the application of that rule and compels a decision adverse to the libelants, especially as the witnesses who testified to the facts regarding the light at night and the buoy or stake with a white rag on it during the day are impartial and unbiased and show a normal degree of intelligence.

The evidence of Thompson is impressive. He was a government employee, and first assistant keeper of the Green Ledge Light Station. He was an intelligent witness and was in the lighthouse watching the Marion's approach and was particularly attracted by her course, as she was not on the regular course, but was bearing southerly on a line with the Kingdon. He first saw her with the naked eye, and finally "put the glasses on her," and while looking at her approaching Green Ledge Light, he was in a position to see the markings on the Kingdon which was then between the lighthouse and the Marion, and he testified positively that the markings were there.

Part of his testimony is as follows:

"Q. How long were you there at the lighthouse after December 13, 1917? A. I never left the station from the time the barges were sunk until the 1st of February; the first day of February I went ashore.

"Q. How much of that wreck did you see at low water? A. Well, I should say, four feet.

"Q. On which end, the northerly or southerly end? A. Northerly.

"Q. Did you observe, during the period of time from December 13th up to February 1st, this boat or the location at which this boat was lying in the nighttime? A. Oh, yes.

"Q. Can you tell us whether or not there was a light on that boat in the nighttime? A. I saw a light every time I had occasion to look out that way.

"Q. Did you observe the wreck of the Kingdon in the daytime during the period from March 1st to March 7th? A. I was on her about every day from the 2d until the morning of the 7th.

"Q. You were on her every day? A. I was on her or to her every day from the 2d until the morning of the 7th.

"Q. You were there every day? A. I was there to her every day.

"Q. Did she have a marking on her at nighttime? A. Yes.

"Q. What marking did she have on her? A. A buoy and an oyster stake with a piece of rag attached where we kept the lantern; that is the stake we hang the lantern to.

"Q. What can you say as to whether or not there was a light on the wreck? A. There was a red light there every night.

"Q. Coming down to the night preceding the wreck of the Marion, did you do anything with respect to putting that light out on that preceding night? A. I was over there about an hour before sundown, put my lantern on the barge, and by the time I got back it was time to light my lantern at the station."

Richard G. Hendrick, who was keeper of the Dolphin Lights in Norwalk Harbor, was employed by the respondent to attach stakes to the Kingdon as well as other barges sunk in various places. After examining the wrecks, he came back to Norwalk and secured, as he testified, "four big cedar oyster buoys and I anchored them with stones and rope. There is always a hole bored in the end of them, one about 25 or 30 feet off the north end of the barge Kingdon, one on the south end of the barge Sally, one on the south end of the barge Miller, and kept one in the boat."

He further testified:

"Q. When was the next time after that time that you went out to the Kingdon? A. In the boat?

"Q. Yes—well, in any way? A. I couldn't go on the ice to the Kingdon, but I went out about the 22d or 23d or 24th of February; I went to the Kingdon in the boat.

"Q. How did you find conditions at that time? A. The oyster stake that was nailed on her previous had disappeared, * * * but the buoy, the fender, was still on her side, and the buoy at her bow of the Kingdon was still anchored there.

"Q. Then when did you go again after that? A. Well, every day until the 2d day of March.

"Q. How did you find things on that day? A. The light was in position.

"Q. What else did you see? A. The buoy anchored off the north end of the Kingdon and the fender on the south end.

"Q. Did you see the mark made by the Marion as she went over the wreck? A. Yes, sir."

The evidence further shows that both Hendrick and Thompson were employed by the respondent to keep the wreck of the Kingdon properly and at all times lighted and buoyed, and they were authorized to hire such additional help as they needed to effectuate this purpose. The respondent hired the men most available, Hendrick, who had a power

boat and who daily attended the Dolphin Lights, and Thompson in the lighthouse only 2,600 feet from the wreck.

[3] The criterion as to whether or not there had been negligence on the part of the owners of the barge must be measured by the reasonableness or prudent conduct of the person charged with the duty to comply with the provisions of section 15, c. 425, of the Law of 1899 (Comp. St. § 9920), supra. Did the respondent act as a reasonably prudent person should have acted under similar circumstances? The rule laid down in Sullivan v. Ross (C. C. A.) 263 Fed. 350, is the rule to be applied in cases predicated upon negligence. Judge Hough said (page 350):

"A majority of this court are of opinion that the owner's responsibility is to be measured, not by what might have been done, but by what was actually done, and that the sufficiency of the steps taken are to be judged by what men of reasonable skill and acquainted with the conditions of New York Harbor would do under similar circumstances."

For the purposes of this case it is unnecessary to decide whether the lantern was burning every night from December 13, 1917, up to March 7, 1918. The pertinent inquiry is: Was it burning on the night of March 6th and was there a stake or buoy on or near the wreck to indicate its location on the morning of March 7th? In this connection Thomas Hendrick, who is now the tender of the drawbridge over the Norwalk river, but who, in March, 1918, was the master of an oyster boat and started on March 2d to work with the boat, testified:

"Q. Did you at any time between that time (March 2d) and the time when the Marion ran over the wreck go near to the wreck? A. Yes.

"Q. When? A. Along towards half past 5, 5 or half past 5, March 6th.

"Q. That was the night before? A. Coming in.

"Q. Tell us what you saw? A. I saw a small buoy which I took to be an oyster buoy laying north of the wreck. I saw another stake which was straight up and down with a lamp, and I saw a fender down at the south end on about a 45 degree angle in the water."

It is unreasonable to assume that a witness with a responsible city position would come into court and perjure himself by giving positive testimony of this character if the facts were otherwise. The trier can reach no other conclusion, in the face of such evidence, than that the barge was properly marked, so that the navigator of the Marion could have seen the markers had he been attentive to his duties.

The presence of both Hall and Walling in the pilot house was·explained by Walling on the ground that it was necessary for both of them to handle the boat from the pilot house. Both of these men were men of experience in navigation and were familiar with Norwalk Harbor. The testimony shows that Walling must have known that certain barges were sunk in the harbor, and he testified that, while he had heard about it, he took no particular notice of it and did nothing to ascertain the location of them.

There was no lookout in the bow of the steamer. The rule with reference to a lookout is clearly stated by Judge Ward in Delaware L. & W. R. R. Co. v. Central R. R. Co. of New Jersey et al., 238 Fed. 560, on page 562, 151 C. C. A. 496, on page 498. He said:

"The fundamental rule of the admiralty is that a vigilant lookout must be kept on all vessels, so that collision may be prevented even with those which are violating the rules. This is emphasized by article 29 of the Inland Regulations (U. S. Comp. St. 1913, § 7903), applicable to this provision, which provides: 'No Vessel under Any Circumstances to Neglect Proper Precautions. Art. 29. Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.' Who can say that this negligence on the part of the Roselle did not contribute to the collision? There is no obligation in navigation that this court is more disposed to enforce than the duty of keeping a proper lookout."

No satisfactory explanation has been offered why Hall and Walling were both in the pilot house, nor has any satisfactory reason been given why no lookout was in the bow. I do not hold, as matter of law, with reference to this case, that on a clear day, under favorable conditions, and with an unobstructed view, that a lookout should have been in the bow, but in the exercise of ordinary care, and in an attempt to prove the neglect of another, the libelant has failed, in view of all the evidence, to sustain the burden imposed upon him of proving, by a fair preponderance of the evidence, that the owners of the Kingdon were guilty of negligence.

In my view of the case it becomes unnecessary to determine what caused the accident, as it is sufficient to say that there was no negligence on the part of the respondent, and this conclusion justifies judgment for the respondent; but, if we may indulge in inference, it is my opinion that in all probability, after the Marion had straightened out after passing the black buoy off Tavern Island and her engines were "hooked up at full speed," as the captain expressed it, and was on a course to the north of the Green Ledge Light, her navigators engaged in conversation and were inattentive to her exact course in the channel and were content in their minds that there was either no obstruction ahead or had carelessly forgotten to be on the lookout for it, or that Walling, because of his long period of being on duty, was not in fit condition to navigate the ship.

[4] The effect of the failure of Capt. Hall to appear in court, or the failure to offer his deposition, raises no inference necessarily adverse to the libelant, particularly as his illness was certified by a reputable physician. On the other hand, I cannot assume that his testimony could be beneficial to the libelants. I draw no inference, favorable or otherwise, by reason of Capt. Hall's absence from the witness stand.

In view of the conclusions reached, it becomes unnecessary to discuss laches in bringing the suit or any other points raised in the briefs.

The libelants had the burden of proof to establish their case by a fair preponderance of evidence and to show that the respondent was negligent within the meaning of the law. The better evidence, the greater weight of evidence, shows that on the day and at the time of the collision the Kingdon was properly lighted and marked, and that the accident happened through no fault of the respondents. The libels are therefore dismissed.

Decrees accordingly.